### LINDEKE et al. v. ASSOCIATES REALTY CO.

#### (Circuit Court of Appeals, Eighth Circuit. July 30, 1906.)

#### No. 2,419.

1. LANDLORD AND TENANT—CONSTRUCTION OF LEASE—FORFEITURE FOR BREACH OF COVENANT.

A lease for the term of 50 years of real estate in the business district of a rapidly growing city, after stipulating for the payment of rent, taxes, etc., by the lessee, provided that in case of default for 60 days "in the payment of any of said rent, taxes, or assessments * * * or in the performance of any of the covenants or agreements on the part of the said second party to be performed," the lessor should have the right on notice to forfeit and terminate the lease and re-enter. Following were covenants to keep the sidewalks and alleys in repair, to insure, to observe a party-wall agreement, and to remove the old buildings and build and complete within 5 years a 5-story business building covering the entire lot, from plans to be approved by the lessor. The lease was subject to a mortgage for $50,000, which the lessor agreed to pay, and time was made of the essence of the contract. *Held*, that construing the lease in the light of the circumstances surrounding the parties, the length of the term, and the nature and condition of the property, the lessor's right of forfeiture was not limited to the case of default in the payment of rent or taxes, but extended to a default in the performance of any of the covenants and especially that to build, which was evidently one of the principal objects of the lease.

[Ed. Note.—For cases in point, see vol. 32, Cent. Dig. Landlord and Tenant, § 331.]

2. CONTRACTS—RULES OF CONSTRUCTION—RULE OF EJUSDEM GENERIS.

Although a general term follows specific words in a contract, it will not be restricted by them under the rule of ejusdem generis where it is ap-

parent from the entire contract that a larger object was in the minds of the parties, to which the general phrase can distinctly apply when given its ordinary meaning.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, § 737.]

3. LANDLORD AND TENANT—WAIVER OF RIGHT TO DECLARE FORFEITURE OF LEASE—ACCEPTANCE OF RENT.

A lessor having a right to declare a forfeiture of the lease, and who has served notice of such forfeiture, does not waive his right by the subsequent acceptance of rent from the lessee covering a period which will expire before he is entitled to re-enter under the terms of the lease.

[Ed. Note.—For cases in point, see vol. 32, Cent. Dig. Landlord and Tenant, § 345.]

4. SAME—NOTICE TO QUIT—SERVICE ON CORPORATION.

Where a corporation is tenant under a lease, service of notice to quit upon its treasurer is a good service upon the corporation, both at common law and under Gen. St. Minn. 1894, § 5199, which provides that in an action against a corporation, service of summons may be made on its president, secretary, cashier, treasurer, a director or managing agent.

5. BANKRUPTCY—EFFECT OF ADJUDICATION—LANDLORD AND TENANT—NOTICE TO QUIT.

Where notice to quit was served on a corporation tenant, its subsequent adjudication as a bankrupt did not affect the efficacy of the notice nor necessitate a reservice upon the trustees in bankruptcy who took only the rights of the bankrupt at the time of the adjudication.

6. EQUITY—ENFORCEMENT OF FORFEITURE.

The rule that courts of equity will not enforce a forfeiture is not absolute or inflexible, and does not extend beyond the reasons which underlie it, and where its enforcement is more consonant with the principles of equity than the denial of such enforcement equity will enforce it in a case within its cognizance.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Equity, §§ 69–76.]

7. BANKRUPTCY—LANDLORD AND TENANT—ENFORCEMENT OF FORFEITURE OF LEASE.

A corporation tenant for a long term failed to perform a covenant of the lease which required it to build an expensive building on the leased premises, and after notice of a forfeiture of the lease in accordance with the terms thereof had been served upon it, was adjudged a bankrupt, and its assets passed into the hands of its trustees. *Held*, that on petition of the lessor, the court of bankruptcy properly decreed the enforcement of the forfeiture, and directed the trustee to surrender possession of the property as the only effective remedy for the protection of the rights of the lessor.

Appeal from the District Court of the United States for the District of Minnesota.

The appellee, the Associates Realty Company, a corporation of Minneapolis, Minn., being the owner of 44 feet of lots 1 and 2, in block 221, in the city of Minneapolis, with the store building thereon, leased the same, on the 26th day of March, 1900, to J. F. Evans, R. W. Munzer, Adam Pickering, A. V. Hamburg, W. A. Alden and J. F. Elwell, partners under the firm name of Evans, Munzer, Pickering & Co., to run 50 years from the 1st day of April, 1900, at an annual rental of $5,000, to be paid in quarterly installments in advance, upon the 1st days of April, July, October and January of each year during said term; and further, and in lieu of additional rent, to pay all taxes and assessments of every kind and nature which may be assessed against any part of said leased premises, or against any buildings, structures, or improvements thereon or which might thereafter be placed thereon during said term. "And in consideration of the premises, the said parties of the second part (Evans, Munzer, Pickering & Co.), for themselves, their heirs, executors, administrators and assigns, do hereby covenant and agree to and with the said party

of the first part. its successors and assigns, that the said parties of the second part will, and their heirs, executors, administrators, and assigns shall, at all times during the continuance of this lease, pay the rents which may become payable under this lease, and all taxes and assessments which may be levied upon or assessed against the said leased land, and against any buildings, structures, or improvements now on said land, or that shall hereafter be placed thereon during said term, or against any part of the same, promptly, and as above provided.

"It is further agreed between the parties hereto as one of the conditions upon which this lease is made, that 'if said parties of the second part, their heirs, executors, administrators or assigns, shall make default for the space of sixty (60) days in the payment of any of said rent, taxes or assessments, when any of the same shall become payable, or in the performance of any of the covenants or agreements on the part of the said parties of the second part to be performed, the said party of the first part, its successors or assigns, may give said parties of the second part, their heirs, executors, administrators, and assigns, notice in writing of its or their intention to terminate this lease, and all the rights thereby reserved or granted unto the said parties of the second part, which notice shall be subscribed by the said party of the first part, its successors or assigns, or its agent or attorney, and shall specify the sums of money, or the covenant or agreement on account of the nonpayment, or nonperformance of which such declaration of forfeiture shall be made; and if the said parties of the second part, their heirs, executors, administrators, or assigns, shall not within four (4) months after the time of service of said notice, pay the rents, taxes, or assessments for the nonpayment of which said forfeiture shall have been declared, together with interest on said rent from the time the same shall have been due and payable, and any and all expenses that said first party shall have incurred in and about the preparation and service of said notice, or shall not perform the covenants or agreements for the nonperformance of which said forfeiture shall have been declared, then and in that event this lease shall, from and after the termination of said four (4) months, become ended and determined, and all rights of said parties of the second part, their heirs, executors, administrators and assigns hereunder, shall be forfeited and lapse as fully as if this lease had expired by lapse of time, and all buildings and improvements thereon shall remain as attached to the freehold and become and be the property of the party of the first part, its successors and assigns. And the said party of the first part, its successors and assigns, shall at once have all the rights of re-entry upon said premises, and to repossess and have and enjoy the same, which it, or they, would have upon the expiration of this lease by lapse of time."

It is further covenanted and agreed that upon the termination of the lease, whether by lapse of time or under any of the conditions or provisions contained therein, the lessees or their assigns would peaceably surrender the possession of the property and the buildings and improvements thereon unto the lessor, its successors or assigns; except that such buildings that might have been previously removed from said premises are freed from the provisions of the contract; and that no waste or injury to said premises, or to any building thereon, should be permitted or committed by the lessees or any persons holding under them during the continuance of the lease.

The lessees further covenanted and agreed to keep the sidewalks, alleys and passageways contiguous or appertaining to the leased premises in good repair and free from obstructions as might be prescribed by the city of Minneapolis; and to indemnify and hold harmless the lessor against claims or demands that might be made by reason of any defect, imperfection, or obstruction in said sidewalks, alleys or passageways.

The lessees covenanted and agreed to keep the buildings insured in some reliable fire insurance company or companies, selected by the lessor, in an amount equal to the insurance value of said buildings, and cause the insurance policies to be made payable, in case of loss, to the lessor or its mortgagees, as collateral security for the payment of the rents due or to become due, and for the payment of taxes, assessments, and charges against said real estate; and that so soon as the new buildings hereinafter provided for should be erected, the

lessees would cause the same to be insured in at least the amount of $12,500 and keep the same insured for not less than said amount, in some reliable insurance company selected as aforesaid, with a like provision respecting the payment of loss to the lessor, as collateral security, whether said policies are held and made payable in that way or not.

It was further covenanted and agreed that in case of any default by said lessees as aforesaid in the payment of any rents, taxes, or assessments due under the terms of the lease, the lessor, at its election, instead of declaring the lease forfeited might pay the taxes or assessments in default, and that all rents in arrears, and such taxes and assessments and insurance premiums paid by said lessor should become a specific lien and paramount to all other liens, drawing interest at the rate of 6 per cent. per annum; with power to foreclose said lien and sell the said leasehold estate, buildings. etc., at auction, as in case of the statute relating to the foreclosure of mortgages, and out of the purchase money to retain the amount of rent in arrears, taxes, assessments, and interest as aforesaid. Said lease was made subject to the terms and conditions of a certain party-wall contract made between certain parties and entered upon the records of the county, the conditions of which the lessees assumed and agreed to perform, and to indemnify the lessor harmless therefrom. It was also made subject to a mortgage thereon, which the lessor agreed to pay off, which mortgage was in the sum of $50,000. The said lessees for themselves, their heirs, executors, etc., further covenanted and agreed with the lessor that they would within five years from the 1st day of April, 1900, erect and complete upon said leased premises a substantial business building, to cover the entire property leased, at least five stories in height, and as substantial in character and attractive in appearance, and equal in manner and cost of construction to the building now occupied by said lessees adjoining said described premises, and would complete the same in all respects free and clear of any liens within the time aforesaid, and that they would cause the same at once to be insured as before stated.

It was further covenanted and agreed that before the old buildings situated on the premises were torn down and removed, the lessees should first enter into a valid contract with a responsible contractor providing fully for the erection and completion of said new building, according to plans and specifications providing for a building of the kind, etc., aforesaid, which said contract should specifically provide that said building should be so erected and completed within a reasonable time therein specified, free from any lien or claim on the part of the contractors, and should be submitted to and approved by the lessor before the building standing upon the premises should be demolished as aforesaid. It was covenanted that the lessees or their assigns on paying the rents, taxes, assessments and insurance charges, and performing the covenants and agreements provided for in the lease, could peaceably hold and enjoy the premises during the continuance of the lease. The further covenant and agreement was that at all times during the last year of the said term of the lease and after the end of said first term, the lessor should have the option either to buy the improvements on said land or to sell said land to the lessees at a valuation in either case to be arrived at by arbitration, or to release said premises to the lessees for a further term of 20 years, at an annual rental of 5 per cent. on the fair market value of the land exclusive of the improvements, to be fixed by arbitration. Said valuation, however, not to be less than the initial valuation thereof of $100,000, agreed to be the present value of the land exclusive of the improvements; and to relet the same for a further successive term of 20 years at the expiration of said term, and thereafter to relet the same for a further term of 10 years, unless the lessor shall have either purchased said improvements on said land or shall sell said lands to the lessees, at a valuation in either case to be arrived at by arbitration; the lessees covenanting that they would either buy said leased lands or sell the improvements thereon or release said lands on the basis as fixed by such arbitration (in case of reletting, however, such valuation in no case to be less than $100,000), at the election of the lessor. The manner of selecting the arbitrators under the provisions of the lease was then set out.

And finally it was mutually covenanted and agreed "That all covenants,

promises, undertakings, agreements, obligations. liabilities, grants, or powers entered into, made, assumed or undertaken by either party thereto in and by this lease, shall bind as well as inure to the benefit of the successors and assigns of said party of the first part, and the heirs, executors, administrators and assigns of said parties of the second part hereto respectively, whether so particularly provided herein, or otherwise, and that time is of the essence of this contract."

The said lessees immediately entered into possession of said leased premises, and conducted a mecantile business therein, and continued such possession until the month of April, 1902, when they became incorporated under the laws of the state of Minnesota under the corporate name of Evans, Munzer, Pickering & Co., which corporation took over the business and obligations of said copartnership firm, and held possession of the premises until April 23, 1904, when it changed its corporate name to that of Evans, Johnson, Sloane Company, which latter corporation continued to occupy and hold the premises under the lease until the 13th day of October, 1905, at which date it was duly adjudged a bankrupt by the United States District Court for the District of Minnesota. On the 13th day of November, 1905, the appellants herein were duly appointed trustees in bankruptcy of the estate, and took possession of the business and assets of the estate and entered into possession and occupancy of said leased premises, which they have ever since held. The said corporation, Evans, Johnson, Sloane Company, paid to the lessor the rent for the premises which fell due on the 1st day of April, 1905, for the three months of April, May, and June, 1905; and on the 8th day of August, 1905, it paid to the lessor the rent which fell due on the 1st day of July, 1905, for the three months of July, August, and September, 1905. No rent has since been paid or demanded since the 1st day of October, 1905. Neither of said lessees, Evans, Munzer, Pickering & Co. or either of said corporations, their successors, complied with the covenants contained in said lease respecting the erection of said new building, or took any steps looking to its performance at any time from the 1st day of April, 1900, to the 1st day of April, 1905, or at any time thereafter; but refused and neglected to perform said covenants, and wholly defaulted therein. The said default having continued for more than 60 days after the time when said covenant to build should have been performed, as in the lease provided, the lessor on August 1, 1905, elected to declare, and did declare, its intention to terminate said lease, and all the rights therein reserved or granted unto the lessees, their successors, and assigns; and delivered a notice in writing thereof which was served on the 1st day of August, 1905, on said lessees, Evans, Munzer, Pickering & Co. and the corporation, Evans, Johnson, Sloane Company.

On the 2d day of December, 1905, the lessor made demand upon the trustees in bankruptcy to surrender and deliver to its possession said premises, which they refused to comply with, and have ever since held and retained possession and occupancy of the premises. On December 21, 1905, the lessor, the Associates Realty Company filed its petition in the United States District Court for the District of Minnesota, setting out the facts aforesaid, praying judgment for the rental value of the property during the detention by the trustees in bankruptcy, and for the enforcement of their right to forfeit, and for possession of the premises. Decree accordingly; to reverse which the said trustees in bankruptcy have brought the case here on appeal.

E. H. Morphy (F. H. Ewing and John M. Bradford, on the brief), for appellants.

Ralph Whelan (M. B. Koon and William H. Bennett, on the brief), for appellee.

Before VAN DEVANTER and ADAMS, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge, after stating the facts as above, delivered the opinion of the Court. There are a large number of assignments

of error—21 specifications—but as is not infrequently the case, only a few questions are involved determinative of the controversy. A dozen and one are to findings of fact by the trial court, and the other 8 present the reverse side, that the court erred in not finding the issues for the appellants.

The essential question for decision is whether or not the right to declare a forfeiture of said lease and leasehold estate, with the consequent right of re-entry by the lessor, arose by reason of the failure of the lessees to erect and complete the new building on the leased ground within the five years as prescribed by the demise. The contention of appellants is that the forfeiture clauses of the lease have exclusive reference to the matter of the failure to pay the reserved rentals as they became due, to pay the taxes, assessments, and the like. The contention of appellee is that the right of forfeiture extends as well to the failure by the lessees to erect the new building within the prescribed period of five years. In a contract like this, of many specifications and covenants, in ascertaining the application of the forfeiture provisions it is a sensible thing to do to place ourselves as near as may be in the attitude and relation of the parties respecting the subject-matter of the contract at the time of its execution, and then taking the instrument by its four corners, read it, and so construe it as to harmonize and give effect to all its material parts, so as to give it a reasonable and praticable application.

As appears from the record, the property in question is located near the center of the mercantile district of Minneapolis, a city of rapid development and steady growth. The buildings on the leased premises were old, worn, and illy constructed, not in rapport with surrounding business houses, nor were they adequate by comparison to the accommodation of a growing mercantile establishment. It was, therefore, apparently to be desired and expected by the lessees that a more attractive and commodious building should supplant the old one in view of their long tenure, with the option to buy at the end of the five years or to continue the term for successive periods. The lot itself was estimated to be of the value of $100,000, and at the time was subject to a mortgage of $50,000. It was, therefore, of importance to the lessor to have the new building contemplated constructed, as it would not only enhance the security for the rental money and the other acts to be performed by the lessees, but would greatly augment the value of the property in case of the purchase by either under the option. In view of this situation, let us examine the covenants and forfeiture provisions. The opening consideration of the contract is the payment of the rentals and taxes as well as the performance of the covenants and agreements to be paid and performed by the lessees. It was expressly covenanted and agreed that the lessees within five years from the 1st day of April, 1900, would erect and complete upon said premises a substantial business building to cover the entire property leased, five stories in height, attractive in appearance, etc., and that as soon as the new building should be completed they would insure it in a sum not less than $12,500 for the better security of the lessor. It was further agreed, as one of the conditions

upon which the lease was made, that if the lessees should make default for the space of 60 days in the payment of any of the rents, taxes, or assessments, "or in the performance of any of the covenants or agreements on the part of the said parties of the second part to be performed," the lessor, after giving the specified notice to quit, could end the lease. This is followed by the covenant that upon the termination of the lease, "whether by lapse of time, or 'under any of the conditions or provisions contained herein," the lessees would peaceably surrender the premises. From all of which it appears that the respective covenants alike pertained to the acts, the things to be done by the covenantors—to the obligation to build as well as pay rentals, taxes, etc. The mere separation of the provisions into distinct paragraphs was merely the mode adopted by the draughtsman for convenience or method of construction. So while the argument of the learned counsel for appellants is ingenious in the attempt to limit the forfeiture clauses to the paragraph respecting the failure to pay rentals, taxes, etc., it is more specious than reasonable.

It hardly admits of controversy that immediately, coupled with the covenant and agreement to pay rentals, taxes, etc., is the covenant or agreement to build, and that failure to perform both or either is expressly made the basis of the declaration and enforcement of the forfeiture. This uniting of the right of forfeiture is exemplified in the succeeding covenant that "upon the termination of this lease, whether by lapse of time, or under any of the conditions or provisions contained herein" the lessees would peaceably surrender the possession, etc. And should the lessees pay the rentals, assessments, taxes, insurance, and charges and perform the covenants and agreements provided for in the lease, they should hold and enjoy the premises. So it is made clear that the right of the lessees to hold and enjoy was made to depend not alone upon the payment of the rents, taxes, insurance, etc., but as well upon their performance of the other covenants and agreements, which indisputably would cover the building clause. And it is significant in this connection that in the closing paragraph of the lease it is declared that time is of the essence of this contract. There is nothing strained or unreasonable in this view of the contract. It necessarily devolved upon the lessees to remove the old structure to make place for the new, to get out the plans and specifications therefor, and during the change to submit to the interruption of business consequent thereon. The usual bond given by lessees for the construction of new buildings within the prescribed time was not exacted in this case. In lieu thereof it was deemed a sufficient guaranty to the lessor and incentive to the lessees that the building would be constructed as agreed upon, that the forfeiture provision hung suspended over the heads of the lessees.

Some stress in argument is laid upon the phrase found in the provision respecting the letting of the lessees of the contract for the erection of the new building, which requires "that said building shall be so erected and completed within a reasonable time therein specified." By giving to this the insulated office of an independent stipulation,

read in connection with the plans and specifications to be submitted to and approved by the lessor, counsel for appellants builds the hypothesis that is was not in the contemplation of the parties that a forfeiture might be predicated of the building covenant. The argument is that the lessees had the full five years in which to begin the work of building; that as the plans and specifications had to be prepared and submitted to the lessor, subject to its approval, which might detain at will and finally reject them, necessitating the getting up and submitting new ones—a process that might go on during the entire five years of the term—and hence the provision was inserted that after concurrence in the plans and specifications, a reasonable time should be allowed the lessees for completing the building, which might extend beyond the five years' period. There are several satisfactory answers to this contention. The language "said building shall be so erected and completed within a reasonable time therein specified," has exclusive reference to the prescription as to the contract the lessees were to enter into with their contractor for the work. To prevent dallying and unnecessary delay as between the lessees and the contractor it was provided that the erection and completion should be within a reasonable time, having regard to the delays and interruptions ordinarily incident to the execution of such contracts. In no degree, however, did it contradict or mitigate the primary covenant and agreement between the lessor and the lessees that the building was to be completed within the five years. In respect of the suggested possible delay the lessor might occasion by the detention and final rejection of any plans and specifications submitted to it, it is sufficient to say (1) that the business desire of the lessor to have a new building upon the lots would presumptively make it to its interest to avoid any captious delay or objection; and (2) if it should act arbitrarily in the matter, the law would afford ample protection to the lessees in preventing a forfeiture declared by the derelict lessor.

In further support of the contention that the forfeiture clause was not intended to attach to the covenant to build, reference is made to that provision of the lease which gives the lessor, in lieu of the right to declare a forfeiture, a specific lien for rents, taxes, etc., paid by the lessor. The argument being, if we comprehend it, that this provision indicates that the paramount thought in the mind of the lessor was to secure the payment of the rents, taxes, etc., and, therefore, the provision for the summary remedy by declaration of forfeiture and re-entry should be limited to that object. Such alternative provision is usual in contracts of lease, giving the lessor the right of election, to rely upon the lien and continue the lease if he deem it more advantageous than to put an end to the tenancy. How from such alternative provision a reasonable inference can be drawn that it does not consist with the right of forfeiture for default in keeping any other important covenant in the lease is not manifest. As already attempted to be shown, by an analysis of the various paragraphs of the contract, construed in the light of the attendant circumstances, the obtaining of the rentals and the construction of the new building were the paramount objects of the scheme, and are in such co-

relation as to clearly indicate that the forfeiture clause applies indifferently to the allied covenants. Unless the expression in the contract fairly excludes this intendment it should prevail. Recognizing the embarrassment of the fact that the forfeiture clause follows the failure to make "payment of any of said rents, taxes, or assessments, or in the performance of any of the covenants or agreements on the part of the said (lessees) to be performed," resort is had by appellants' counsel to the rule of ejusdem generis, that the later general phrase should be limited to the like matters of rent, taxes, and assessments particularized as the antecedent. This rule has no controlling force in construing a contract where it is plain that a larger object was in fact in the minds of the parties to which the more general phrase can distinctly apply. Given v. Hilton, 95 U. S. 591–598, 24 L. Ed. 458, where it is said that "this rule of construction rests on a mere presumption, easily rebutted by anything that shows the larger subject was in fact in view." Sutherland on Statutory Construction, § 279, says:

"The sense in which general words, or any words, are intended to be used furnishes the rule of interpretation, and this is to be collected from the context; and a narrower or more extended meaning will be given, according as the intention is thus indicated. To deny any word or phrase its known or natural meaning in any instance the court ought to be quite sure that they are following the legislative intention. Hence, though a general term follows specific words, it will not be restricted by them when the object of the act and the intention is that the general word shall be understood in its ordinary sense."

No one particular class or thing is enumerated in the lease contract upon which the rule of ejusdem generis invoked can rest. The reference in the forfeiture clause is to things enumerated—the payment of rent, taxes, assessments, etc., and other covenants and agreements in the lease, among which is the covenant to build.

Reduced to its ultimate effect, the contention of appellants would allow the tenants to break every covenant in this lease except the mere obligation to pay rents, etc. They could commit waste, to the great injury of the premises; suffer the sidewalks, alleys and passageways to get so out of repair as to make the place inaccessible or uninhabitable; they could violate the party-wall contract, and fail to erect any new building; yet, so long as they complied with the single covenant in paying rents, taxes, etc., they could escape the entire forfeiture clause, notwithstanding the failure to perform the other covenants to be performed is expressly declared to be a ground of forfeiture. This is so obviously opposed to the whole scheme of the lease and the efficient means for enforcing observance of the material covenants as not to appeal to our approval.

Contention is made that the acceptance of the rent after the 1st day of July for the quarter ending October 1, 1905, constituted a waiver of the right to declare a forfeiture for the breach of the building covenant. The five years within which the lessees were to erect and complete the new building expired April 1, 1905; on Aubust 1, 1905, notice to quit and surrender was given. Under the requirements of the four months' notice, the right to re-enter accrued De-

cember 1, 1905. No rent was paid beyond October 1, 1905. We understand the rule of law to be that a waiver in such instance applies where the rent has accrued and been accepted after the right of re-entry has attached on account of forfeiture; and not where it is paid and accepted as due for a period prior thereto. Big Six Development Company v. Mitchell (C. C. A.) 138 Fed. 279, 1 L. R. A. (N. S.) 332; Douglas v. Herms, 53 Minn. 204, 54 N. W. 1112; Gluck v. Elkan, 36 Minn, 80, 30 N. W. 446; Norris v. Morrill, 43 N. H. 213; Campbell v. McElevey, 2 Disney, 574; Jackson v. Allen, 3 Cow. (N. Y.) 220, 230; Blecker v. Smith, 13 Wend. (N. Y.) 531; Hunter v. Osterhoudt, 11 Barb. (N. Y.) 33; Price v. Norwood, 4 Hurlstone & Norman, 511.

Objection is made to the service of the notice to quit. Service was made August 1, 1905, upon the corporation, Evans, Johnson, Sloane Company, by delivering to and leaving a copy with Rudolph Altshul, he being the treasurer of the corporation. In Kansas City Railroad Company v. Daughtry, 138 U. S. 305, 11 Sup. Ct. 308, 34 L. Ed. 963, the court said: "At common law, service was made on such head officer of a corporation as secured knowledge of the process to the corporation." 2 Taylor on Landlord & Tenant, § 481, says: "Notice to quit. When a corporation is tenant, the notice must be addressed to the corporate name, and served upon one of its officers." Under the general laws of Minnesota service of summons upon a corporation defendant in the district court in a civil action is by delivering a copy thereof to the president or other head of the corporation—secretary, cashier, treasurer, a director, or managing agent. Section 5199, Gen. St. Minn. 1894. As the lessees named in the lease contract were individuals it accounts for the absence of the usual prescription where the lessee is a corporation as to how the notice to quit should be served. The service of notice in this case we think was good under the local statute of the state, and was good at common law, made upon so important an officer as the treasurer as a means of conveying notice to the corporation. The service being good at the time when made upon the corporation, the subsequent adjudication of bankruptcy and the selection of trustees did not abrogate the service already made upon the corporation or necessitate reservice on the trustees in bankruptcy. In this respect the trustees succeeded only to the rights and stead of the bankrupt, and took the estate cum onere. Under such circumstances, the trustees stand simply in the shoes of the bankrupt at the time they succeeded to the estate. See York Manufacturing Company v. Cassell et al., 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782; Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577; Yeatman v. Savings Institution, 95 U. S. 764, 24 L. Ed. 589; Hewit v. Berlin Machine Works, 194 U. S. 296, 24 Sup. Ct. 690, 48 L. Ed. 986.

The final contention of appellants' counsel is that the courts are adverse to forfeitures and that they are the abhorrence of courts of equity. Equity, however, still more abhors a failure of justice, as nature does a vacuum. In Brewster v. Lanyon Zinc Company (C.

C. A.) 140 Fed. 801, 819, the conditions under which a court of equity will assist in the enforcement of a forfeiture under lease contracts, are extensively discussed by Judge Van Devanter. His conclusion is aptly expressed in the following paragraph:

"The better view is that the rule is not absolute or inflexible, any more than is every forfeiture harsh and oppressive; that its influence and operation do not extend beyond the reasons which underlie it; and that in cases, otherwise properly cognizable in equity, there is no insuperable objection to the enforcement of a forfeiture when that is more consonant with the principles of right, justice, and morality than to withhold equitable relief. As said by Story, Eq. Jur. par. 439: "The beautiful character and pervading excellence, if one may so say, of equity jurisprudence, is that it varies its adjustments and proportions so as to meet the very form and pressure of each particular case in all its complex habitudes.'"

What would be the attitude of the lessor in this case if the court cannot declare a forfeiture and restore the possession of the premises to it so long as the trustees in bankruptcy may continue to pay the rentals and observe the other requirements of the lease, short of the erection of the new building? A suit for specific performance would hardly lie against the trustees in bankruptcy to erect the new building on the premises. Where would they get the funds applicable to such purpose? If they have other assets than the leasehold interest, the court of bankruptcy could not take that fund which it holds for the benefit of all the creditors of the estate and invest it in a permanent building improvement to run with the lease. Neither would the court of bankruptcy hold up the closure of the administration of the estate through a long period of time for the construction of such improvement as the lease contemplates, and await the result of the income therefrom for distribution among the creditors. The bankrupt law does not contemplate such proceeding. The only remedy, therefore, according to appellants' suggestion, would be an action for damages on the broken covenant to build. The fact of the adjudication of the corporation as a bankrupt shows it is insolvent. Its entire property, including the leasehold interest, has passed to the trustees in bankruptcy for administration among the creditors. Is the lessor to have its claim liquidated and then allowed against this estate, and then participate in a dividend that might not amount to 10 cents on the dollar of its claim? There is no provision of the lease contract which contemplates that such a judgment allowance would be a continuing lien upon the leasehold estate. Under the bankrupt law the leasehold interest would be sold, and the proceeds distributed pro rata among all the general creditors of the estate. If the lessor should present its claim for liquidation and allowance against the estate, the judgment therein would cover the entire present and prospective loss consequent upon the breach of the building covenant, as it is an indivisible unit. The purchaser of the leasehold interest under the sale by the trustees in bankruptcy would not be liable for any antecedent breach of the covenant to build; and if the claim for damages therefor were liquidated and allowed in the bankruptcy proceeding, in any view the purchaser would take the property unburdened of the building covenant. If the claim were not so liquidated, under appellants' the-

ory, even if the lessor should recognize the new tenant, there would be no default on his part as to the building covenant until after the expiration of another five years, and the only remedy of the lessor would be an action for specific performance against, or damages for the breach committed by, the purchasing tenant. It would be difficult to conceive of a situation that appeals more strongly to the equity jurisdiction of the court for protection and relief. The remedy adopted by the lessor in this suit was proper, and the remedy afforded by the decree of the District Court was just.

The findings and decree of the District Court are, therefore, affirmed.